Good morning, Your Honors. Matt Campbell from the Federal Defenders of Eastern Washington and Idaho on behalf of Mr. Scott. I'm going to do my best to reserve five minutes for rebuttal. Organizationally, while we've presented several claims of error, I'd like to focus today primarily on those impacting the defense's fundamental ability to present and argue its case to the jury. Toward that end, I propose to submit arguments C regarding subpoenas, E regarding Agent Gilbert, and H regarding restitution on the briefs. What I'd first like to discuss is our argument F, which is at opening brief, page 41, the denial of a self-defense instruction. One of the defense theories all along in this case was that Mr. Scott had been, in effect, unlawfully imprisoned and thus had been defending himself at the time. The defense had included a discussion of this in its trial brief. The defense had proposed jury instructions specifically on self-defense. And the district court held a lengthy discussion regarding the self-defense issue that's found in excerpts 2761 to 79. And while this may sound contradictory, the parties were generally, I think, in agreement as to what the facts were, or at least the testimony that came from witnesses. But there were significant differences in how those facts should be applied. Specifically, it had been determined that the nurses at issue did not have the ability to involuntarily admit Mr. Scott. The district court agreed that it was, in fact, a voluntary admission. There had been no decision by any physicians to involuntarily admit Mr. Scott. Upon his presentation to the hospital, the testimony was undisputed that Mr. Scott said he didn't want to be there. And, in fact, subsequently Mr. Scott was found at what we've characterized as a back door to the emergency room, trying to get out of the ER. And there was, in fact, testimony that he was sort of pounding on that door. It was at that point that he was approached by one of the nurses, Nurse Hoffman. And Nurse Hoffman essentially said, I want you to get back in bed. I'm going to call police. You have to get back in bed. Mr. Scott did ultimately walk back toward bed. There was a confrontation. That's what led ultimately to the charges in this case. And there was obviously the physical altercation. The issue that the government presented or that the government argued in arguing against this instruction was whether Mr. Scott reasonably believed that force was necessary. It had conceded intoxication. It had conceded the other portions. And those were essentially the facts that were presented to the court. The court, however, in our argument, essentially we believe evaluated those facts, came to its conclusion that it was unreasonable for Mr. Scott to have defended himself and therefore denied the instruction. And that's where we feel the error was made. Counsel, if I could just ask you, in your argument about self-defense, if you're aware of these cases, please explain how you would reconcile your position with Judge Nelson's prior opinion in Acosta Sierra or my prior opinion in Urena. Your Honor, I believe that the issue here would be that, and we've cited to the Morton case, the Mason case, and those cases specifically state that the threshold for evidence to support the defendant's instructions is low. While there is case law that says it must be more than a scintilla, the case law is relatively clear that even if the evidence is weak, insufficient, inconsistent, or of doubtful credibility, the instruction should nevertheless be given. And that's from the Washington case that we cite. Here, Judge Shea appeared to focus on some of the inconsistencies in the facts. For example, he stated that at one point it appeared that Mr. Scott acquiesced, that at one point it appeared that Mr. Scott went back to his bed. And while we fully admit that there were conflicting portions of the facts, there were inconsistencies, we believe that under the standards, those inconsistencies, those facts, were to be addressed by the jury and not the judge in determining whether or not the instruction should in fact be given. And I do want to point out, obviously, I think the standard of review is important here. Here, what we're really arguing is that the instructions failed to present the defense's theory of the case, which I think distinguishes it from a situation where we're arguing about the precise formula. Under these circumstances, we believe that... There doesn't have to be any basis in the evidence for it? I think there does have to be some basis in the evidence. We're not contesting that fact. But we believe that the fact that he stated he didn't want to be there, the fact that at one point he gets up and tries to get out, he's literally at a door, sort of banging on a door to get out, and at that point he is essentially confronted by hospital personnel. What evidence was there that there... Okay, you may be getting into it and I didn't mean to interrupt you, but what evidence is there that there was some use of force against him or excessive force against him that he was resisting? Your Honor, there was some contradictory testimony about who touched whom first. And the defense contested. Admittedly, one of the nurses testified that Mr. Scott head-butted the nurse and that that's what led to the confrontation. The defense contested that fact and essentially presented a version where Mr. Scott was effectively escorted back. Admittedly, not initially. Who presented that testimony? It was through cross-examination of, I believe it was Nurse Hoffman, that essentially he was told to get back, as in without a choice, and sort of escorted back. Admittedly, I'm not arguing that he was hammer-locked or anything, but that he wasn't given a choice. And we believe that that evidence would have been sufficient to warrant the instruction, whether the jury would have accepted it. Drunk as he was. Certainly he was intoxicated. That was clearly a part of the defense case. But unless he had been involuntarily admitted, he was free to leave. And the testimony was uncontroverted, that he had not been in any way compelled to stay there, that he had not been involuntarily admitted. No doctor had made that determination. Turning to Argument D regarding the exclusion of Dr. Brown, we believe this is sort of a related issue, and I think we would argue that the error committed was, in a sense, in a similar way. Dr. Brown was to testify about what's called the Total Military Institution, or the Military Total Institution, which is a syndrome that's been documented for people who have undergone extensive military training. Dr. Brown himself had done considerable research in that area. He taught on sociology. He had previously testified regarding the Total Military Institution. He also had his own experience as a Vietnam vet and as an Army Ranger. He had reviewed discovery in this case. He had reviewed Mr. Scott's military records. He had reviewed Mr. Scott's Veterans Affairs records. He had extensively interviewed Mr. Scott for approximately 15 to 16 hours. Well, what's the error that you – the nature of the error that you claim that district court did? Because he held a Daubert hearing. Correct. And he seemed to be fairly careful about it. Then he excludes Brown's views. What's the Daubert error? Essentially, Your Honor, we believe that the district court overreached in making its Daubert rulings in that, once again, Judge Shea focused on what he found to be some inconsistencies. Specifically, he found that Dr. Brown based some of his determinations on the Ranger creed, which is the Army Ranger's code of conduct and the like. But Judge Shea stated that the records didn't show that Mr. Scott had completed anything beyond the preliminary Ranger training course. I think that would be a perfectly legitimate area for cross-examination for the prosecutor. But if the expert based his opinion with respect to this total military institution theory on airborne Ranger training at a certain level and the evidence was clear that this defendant never had that training, why isn't it legitimate to exclude it because it would confuse and mislead the jury if there's no basis in fact for the opinion? Your Honor, where we would disagree with that would be that he had undergone some Ranger training. He had not undergone as much Ranger training as many, admittedly, but he had undergone some. So our position is that while that would be legitimate as to weight of the doctor's opinion, it would not necessarily go toward admissibility. Similarly, Judge Shea took issue with the fact that Dr. Brown didn't present statistics regarding the probability of Rangers committing assaults. Again, that's a valid area for cross-examination, and I'm sure the prosecution could very well have brought up those issues. However, again, we believe that goes to weight, not admissibility. And from the case law that we've cited, while we understand the Dawbert requirements, we believe that this, in fact, went beyond it. Very briefly, I do want to touch on, I realize I'm at my five minutes, the jury question that arose. And to boil this down, essentially our position in a nutshell is that while the government has cited case law to the effect that voluntary intoxication cannot be a grounds for insanity, our position is that here we had testimony from experts regarding substance abuse disorder, which is a disorder currently recognized in the DSM-IV-R, which states that people can have a substance abuse disorder. The jury was obviously confused by this fact. They came back and asked a question whether that could present grounds for insanity. And our position is that Judge Shea essentially usurped the jury's role when he said no, that, in fact, if we go back to Powell v. Texas, a case cited by the government, it speaks of the current state of medical knowledge. And in this case, we think that the jury was entitled to at least consider whether the expert diagnosis under the DSM-IV-R of substance abuse disorder arose to the level of a mental disease or defect sufficient to create the insanity defense via involuntary intoxication, which is the defense that was raised, not voluntary intoxication. Unless there are specific questions, I'll reserve the remainder of my time. Thank you, Mr. Campbell. Okay, Mr. Russell Smoot from the U.S. Attorney's Office. Good morning. May it please the Court, I am here on behalf of Ms. Bolton, who was, I should say, pretrial counsel in terms of the extensive litigation that preceded the trial in this matter, as well as trial counsel and appellate counsel. And I'm here because Ms. Bolton could not attend today. I have reviewed the briefings, the record, to the extent that I felt that the briefings addressed certain parts of the record. The record is voluminous. It was a nine-day trial. And I'm really here to do my best to try to answer the Court's questions and represent this case, obviously from the standpoint of Ms. Bolton living the case. Well, I'm prepared to address both the two, the issues that the defendant just raised, as well as any issues that the Court has on its mind. If the Court has questions or specific inquiries first, I can go right to there. I don't. I would say I have the same question for you as I had basically for appellant. That is, what on the self-defense instruction, if you're aware of these cases, what's the significance of Judge Nelson's Acosta-Sierra decision and my Urena decision that it cited? In candor, Your Honor, I have to admit that I am not prepared to discuss those particular cases. I would indicate that I would in that vein then shift to, I guess, if the Court decides. Just tell me what is your understanding of what has to be shown to get a self-defense instruction. Yes, Your Honor. The question, I guess, is where this case falls as to whether what was presented was a scintilla, mere scintilla of evidence that doesn't qualify, or whether it meets the threshold of some of the other cases that have said it may be weak, it may be insufficient, it may be inconsistent, or it may have doubtful credibility. Where does the case fall within that? Where do the facts fall? And while the review on a jury instruction such as this is admittedly de novo review, I would argue that this is a case in which, again, the trial court had to weigh the evidence that was presented. And while both parties, I think that the evidence is clear, the defendant got up, the defendant got out of the bed, he was at the door, he returned to the bed, he said that he didn't want to be there. I would argue that what we do when we look at evidentiary factual issues, that we look at the totality of what the facts are. That doesn't necessarily always mean more facts or less facts, but it means what kind of facts are there. I would submit that this is a case in which the defendant was presented voluntarily to the hospital. He was there with his girlfriend. We don't necessarily know if she drug him there or if he agreed to go with her. The bottom line is there doesn't appear to be any evidence of any altercation on the way. So I think that we can infer that he voluntarily went with her to the hospital. While he was at the hospital, he said, I don't want to be here. That does not mean that he is willing to leave. I think we can also infer that that is probably the most common thought that anybody that goes to the hospital for treatment would have. I don't really want to be here. But he stayed. He was convinced to lie down in the emergency room and wait for the doctor. At some point, he got up and he was trying a door. Now, the defense will say that's evidence of him trying to leave. It could also be evidence or, as the nurse Hoffman initially thought, perhaps he was looking for a place to go to the bathroom. We don't know what went through his state of mind at that time, because the evidence is clear that the defendant did not have a memory of the incident and nothing was reported. There wasn't any testimony that I was trying to leave. So what other evidence is there? The defendant came to the Veterans Hospital. The defendant agreed to stay at the Veterans Hospital. The defendant said, I don't want to be here, but there's no record of him ever saying, I want to leave now. I want to get out of here. Let me out of here. The record that I understand and my understanding and my review of the record is that there was none of that. He was put in a bed, as the nurse Hoffman indicated, and I believe one of the other witnesses indicated that what we try to do is we try to persuade people to stay. A nurse may not be able to admit somebody in the hospital under those circumstances until the doctor sees them, but they try to use their persuasion and their reason to have them stay. This is what occurred. The defendant went down and laid in the bed. When he got up, he was persuaded to go back to the bed. He started back to the bed, and then the first assault occurred with the head butting. After that occurred, he was again persuaded to go back to the bed and be seen by the doctor. There's no evidence that at that point he made any announcement that he wanted to leave or anything to that effect. Reason and persuasion, he went back to the bed. While he was in the bed, another nurse came and offered him a warm blanket. He made no response. No, I don't want a warm blanket. I want to get out of here. There was no response at all. As that other nurse, Nurse Best, was present with him, he remained in the bed and then ultimately attacked the other nurse. I would indicate that at that point, any indication or inference that can be drawn from him trying to open a door or saying, I don't want to be here, is nothing more than a scintilla of evidence which doesn't qualify for the factual basis for the self-defense instruction. Could I change the subject? Sure. One of the issues that the appellant wants to submit on the brief is the question of restitution. As I remember from the briefs, there are two nurses who were victims. One was Nurse Hoffman, and that nurse didn't receive very serious injuries, and therefore the medicals weren't very great. Nurse Best, on the other hand, his medicals amounted to $93,000 roughly and his lost wage is $75,000. In preparation for the sentencing hearing or the restitution hearing, he voluntarily submitted to a medical exam. And then when the defense said, well, we would like our own doctor to examine him and provide an independent medical exam, the judge relied presumably in response to an argument that the government made then and continues to make on a statute, 18 U.S.C. 3664 G1, which says no victim shall be required to participate in any phase of a restitution order. And the judge read that. In his short written opinion, Judge Shea quoted that and then says, to take defendant's argument to its logical conclusion, victims of violent crimes could be compelled not only to submit to forced medical examinations, but also to participate in every stage of a contested restitution hearing except the actual drafting of the order by the court. Such a reading of 3664 G1 would render it essentially meaningless and the court rejects this interpretation. In this case, Nurse Best wasn't dragged into these proceedings. Nurse Best submitted to a medical exam. Why does this statute prohibit an independent medical exam, which could have affected $170,000 worth of restitution imposed on this defendant? Your Honor, I would note that the court's reasoning is actually fourfold on the order. I see that the court is aware of the order that's contained at pages 201 to 204 of the supplemental excerpt of record. Your Honor, I think that first the court agreed with the government's representation or the government's argument I should say, concerning that a victim should not be required to participate. And while it's not set forth in the briefing, I think that I would argue, Your Honor, that there's another reason that a victim should not necessarily be required to undergo the medical examination. And I'm sorry I'm drawing the complete blank on the statute concerning victim's rights. But one of the victim's rights, according to federal statute, is that a victim is not to be in a position to where they could be harassed or in certain manners. The word harass sticks out. I think there's other liturgy of words in there. But the point is that if every victim were required or compelled to go through physical exams in these circumstances like this, then I think it would, one, infringe at least, if not on the letter, on the spirit of the victim's rights. Nurse Best and Nurse Hoffman didn't ask to be victims of assault. And they could present limited information in terms of the restitution. The VA hospital could have just submitted that part of it. But at the time, part of Nurse Best's damages or claim was a part of a workman's compensation issue. And I believe that the court addresses it, that waiver, is what I think that the court is, what Your Honor is talking about. On page 204 of the record, it indicates that the courts found that Mr. Best's physical capacity exam was ordered by the United States Department of Labor Office of the Workman's Compensation Program as part of that agency's claim processing. For one, I think that Judge Shea got it correct in terms of saying that that's not necessarily a waiver. That is information that was ordered in another setting. But that information is valid in this case. The defendant argues that there should have been an independent medical examination in order to contradict what was said in this workman's comp evaluation. But I would respectfully submit that the workman's comp evaluation has a reliability in itself simply because it was performed outside of the case, to my understanding and reading of the record. And it was, and quite frankly, it's, well, I see the court has a question. What would the independent medical examination go to? It wouldn't go to the wages that had been paid for the time that they had missed. Is that correct? I, you know, Your Honor, I think that what it would have gone to, what it may have gone to, not speaking from a medical perspective, is if the defendant had medical injuries that were included in the restitution through the payment to the VA. If the medical examination would go to, it appears that if it was ordered to counter the workman's comp evaluation, then. I'm trying to get the elements of the restitution order. It wouldn't affect the amount of time that they had missed that the VA had already paid them for, would it? I don't believe so, Your Honor. Would it have to affect their future loss of earnings? It's future loss of earnings. And as I looked at this, Your Honor, part of the argument was that the basis of that was unreliable and untested. But as I read through exactly what occurred, it appears to me from the record, Your Honor, is that the amount of lost wages equates to $66,000 over the time period, future lost wages, between 2009 and 2025. Part of that lost wages is somehow computed into a loss of pension, which is approximately $12,000, and that's how the $79,000 amount goes payable to Mr. Best, because all of the lost wages up to that time had been taken care of by the VA. I see my time is running out. I just wanted to simply say that the point is that I don't know that an independent medical exam would make any difference. We're talking not complete lost wages for the next 15 years, but the equivalent of potentially $4,000 difference each year. Okay, well, your time is up. We'll see if any other judge has further questions. Okay, I guess you're done. Mr. Campbell, you've got a little over three minutes to go. Thank you, Your Honor. I tried to guess as to which claim to address. It looks like I guessed wrong. So I'd like to address the restitution issue that was just raised. First off, I believe that the issues that Judge Friedman has touched on squarely implicate this Court's decision in United States v. Andrews, which we did cite in our briefing, but primarily I think the issue behind the independent medical examination was that by allowing the workers' comp evaluation to be used, and not allowing an independent medical examination, it really prevented the defense from being able to contest even the factual allegations. And the defense was seeking to dispute the nature of the injuries. There were potential issues of preexisting injuries, whether the full disability had been caused by this or by, I believe it was a rotator cuff. What I'm not understanding is after this they lost work and they had medical bills. Correct. That would appear to be attributable to this incident. Is there any indication that what the VA paid for the time that they lost and the lost wages is inaccurate? Your Honor, I guess it would depend on, inaccurate in the sense that those numbers are what they paid? No. Okay. There was evidence in the record that there was preexisting damage, and I believe it was in the form of a rotator cuff injury that preexisted. And the defense was prepared to have an independent medical examination done in order to determine how much injury actually resulted as proximate cause from this. Wasn't this kind of the glass jaw problem? You know, you take your victim and, yeah. Well, the allegation was that not necessarily, that this person was already injured and that perhaps a fair amount of the injury claimed was related simply to these preexisting injuries. That's why they wanted an independent medical examination done, both to contest future losses, as the court has pointed out, but also whether the losses were actually proximately caused by this assault. And it's important, I think, to recognize that the independent medical exam would have been done by a physician. It could have involved additional testing and the like. And as we've cited, the defense certainly has a right to contest the allegations at issue for restitution. And by insulating us from doing that, we simply had to take at face value, in essence, the report. There was an expert, I believe it was Dr. James, who testified. But in fact, and Judge Shea did mention this at one point in the record, the government essentially cross-examined Dr. James and said, well, you haven't examined Nurse Best, have you? The answer was no. We tried and we were foreclosed from doing so. We believe under Andrews that we are entitled to a reversal of the restitution. I see my time's up. Thank you for your argument. Scott will be submitted. Mary? Do you want to take a break? I need water. So, Mary, it's okay if we take ten minutes? Okay. The court will take a ten-minute recess before concluding the calendar. Sorry about that. All rise. This court stands in recess.
judges: Friedman, Schroeder, Gould